PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 13-3108

_____

UNITED STATES OF AMERICA

v.

DONALD ABRAHAM SOLOMON,
                                        Appellant

_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 2-11-cr-00245-001)
District Judge:  Honorable Joy Flowers Conti

_____

Argued June 4, 2014
Before:  HARDIMAN, SCIRICA and ROTH, *Circuit Judges*.

(Filed: September 15, 2014 )

Robert L. Eberhardt [Argued]
Rebecca R. Haywood
Office of United States Attorney
700 Grant Street
Suite 4000

Pittsburgh, PA 15219
    *Attorneys for Plaintiff-Appellee*

Elisa A. Long [Argued]
Office of Federal Public Defender
1001 Liberty Avenue
1500 Liberty Center
Pittsburgh, PA 15222
    *Attorney for Defendant-Appellant*

———————

OPINION

———————

HARDIMAN, *Circuit Judge*.

Donald Solomon, the former police chief of a hamlet in Southwestern Pennsylvania, was sentenced to more than eleven years in prison after pleading guilty to corruption charges. In this appeal, Solomon challenges the District Court's application of two provisions of the United States Sentencing Guidelines. The first, § 2C1.1(c)(1), is a cross-reference that directs the sentencing judge to apply the Guidelines range for another crime if, for instance, the defendant accepted a bribe "for the purpose of facilitating [that] criminal offense." The second, § 3B1.3, is a two-level enhancement for abuse of a position of trust. Both challenges present questions of first impression.

## I

### A

In 2009, Solomon became the police chief of the Borough of East Washington, Pennsylvania, after a decade as a part-time officer. As chief, he was paid $36,100 a year and was unable to moonlight because he had to be available around the clock. At about the same time, Solomon and his wife divorced after more than fifteen years of marriage. Without going into the sordid details of Solomon's personal life, it suffices to note that his behavior after his divorce attracted the attention of federal authorities and caused them to engage an unidentified confidential informant (CI)—described by Solomon as "an erstwhile friend"—to probe Solomon's criminal tendencies. Solomon Br. 4.

On June 30 and July 1, 2011, the CI met with Solomon to discuss providing security services for an unidentified third person. Solomon agreed to run a criminal history check on the third person, and also asked the CI if the person wanted to Solomon to provide security, as he had "nothing to do on the weekends." The CI said that Solomon might be able to work with him on the job, which required following a vehicle and ensuring that nothing happened to it. The CI told Solomon he would be paid at least "a grand," to which Solomon replied, "[t]here has got to be no paper trail . . . under the table." When Solomon called to inquire about the status of the criminal history check, he was told the person seeking security had a lengthy criminal record; upon reviewing the record with the CI at the police station later that day, Solomon observed that the security job "could be drug related." In reference to the third person, Solomon responded: "Tell him I'm the best cop money can buy."

Solomon met with the CI again on July 8, 2011, and discussed providing security for a 4-kilogram cocaine deal for which they would each be paid $500 per kilogram. On July 27, 2011, Solomon and the CI met with the third person, "Joseph," who was really an undercover FBI agent posing as a drug trafficker. At the meeting, Solomon agreed to provide protection for a multi-kilogram cocaine shipment, and also agreed to wear his police uniform and sit in his police car while doing so. Joseph, in turn, agreed to pay Solomon and the CI $500 per kilogram for their assistance. Solomon also asked Joseph for advance notice so he could divert other officers away from the drug deal. On August 17, 2011, the CI gave Solomon $1,000 cash from Joseph as a "good faith" payment in advance of the shipment.

On August 23, 2011, the staged drug deal took place in a church parking lot in East Washington. Solomon had a shotgun, an AR-15 rifle, and a 9mm handgun with him as he sat inside his marked police cruiser with the CI. When the transaction was completed, Joseph paid Solomon $1,500, and Solomon then gave the CI $700. Solomon agreed to provide security for future shipments, and exchanged phone numbers with Joseph. He also said he would try to obtain two law enforcement-restricted Tasers for Joseph, for $1,000 each; Joseph made clear that he planned to use the Tasers to collect drug debts.

The next day, Solomon confirmed in a text message to Joseph that he would buy the Tasers for a total of $1,700; the CI paid Solomon in cash a week later. On September 9, 2011, Solomon and the CI went to a law enforcement equipment store, where Solomon used his official position to purchase two Tasers for $1,569.90. Afterward, Solomon sent a text to Joseph, telling him he had the two Tasers.

4

On September 14, 2011, Solomon spoke to Joseph on the phone and agreed to provide protection for a 10-kilogram cocaine shipment on September 26 or 27 while wearing his police uniform. Joseph confirmed via text that the transaction would occur on the 26th, and Solomon agreed to be there. On the 26th, Solomon gave Joseph the Tasers, and instructions on how to use them, in a local commuter parking lot. Soon after, Joseph and a fellow undercover agent engaged in another fake drug deal, while Solomon looked on from his police car. Joseph then gave Solomon $5,000 for protecting that transaction, as well as $300 as a tip for acquiring the Tasers. In total, Solomon was paid $8,800 in connection with the drug transactions and Tasers.

On October 26, 2011, Solomon was indicted on three counts of extortion under color of official right, in violation of the Hobbs Act, 18 U.S.C. § 1951. On January 4, 2013, he entered an open plea of guilty.

B

The United States Probation Office prepared a Presentence Investigation Report (PSR), calculating Solomon's Sentencing Guidelines range under § 2C1.1, which applies to extortion under color of official right. After deducting three levels for acceptance of responsibility, Solomon's offense level was 19. He had no prior criminal history, so his initial Guidelines range was 30 to 37 months' imprisonment. Critical to this case and unfortunately for Solomon, § 2C1.1 includes a cross-reference, § 2C1.1(c)(1), which states:

> If the offense was committed for the purpose of facilitating the commission of another criminal

5

offense, apply the offense guideline applicable to a conspiracy to commit that other offense, if the resulting offense level is greater than that determined above.

Because Solomon believed he was providing protection for two cocaine deals and obtained restricted Tasers with the understanding they would be used to collect drug debts, the Probation Office determined that Solomon had accepted the payments "for the purpose of facilitating" cocaine trafficking.

Pursuant to the cross-reference, the Probation Office calculated Solomon's offense level under the Guideline for conspiracy to commit cocaine trafficking, § 2D1.1, to determine whether it was greater than Solomon's offense level under the Guideline applicable to his Hobbs Act crime. Because of the large quantity of (fake) cocaine involved (at least 5 kilograms but less than 15 kilograms), the base offense level was 32, plus a 2-level enhancement for possession of a dangerous weapon on account of the guns Solomon had with him while he was in his police car "protecting" the drug transaction. After applying a 3-level reduction for acceptance of responsibility, Solomon's offense level under the drug trafficking Guideline was 31, resulting in a range of 108 to 135 months, far higher than under the Hobbs Act.

Solomon argued that the cross-reference should not apply because he did not commit and could not have committed "another criminal offense," because everyone else involved in the reverse sting that ensnared him was working for the government. The District Court disagreed.

After the issuance of the original PSR, the Government also asked the District Court to apply an additional 2-level

6

enhancement for abuse of a position of trust pursuant to § 3B1.3, which would further increase Solomon's Guidelines range to 135 to 168 months. Solomon objected on the ground that Application Note 6 of § 2C1.1—the section under which Solomon's sentence originated—expressly prohibits the application of the abuse of a position of trust enhancement. The Government countered that Application Note 6 did not apply because Solomon was being sentenced under § 2D1.1 (drug trafficking), not under § 2C1.1 (Hobbs Act). The District Court agreed with the Government and sentenced Solomon to 135 months, the bottom of his final Guidelines range. This timely appeal followed.

## II[1]

On appeal, Solomon challenges the District Court's application of both the cocaine trafficking Guideline under the § 2C1.1(c)(1) cross-reference and the abuse of trust enhancement under § 3B1.3. We exercise plenary review over a district court's interpretation of the Sentencing Guidelines. *United States v. Grier*, 475 F.3d 556, 570 (3d Cir. 2007) (en banc).

## A

Solomon first claims that the District Court erred by sentencing him under the cocaine trafficking Guideline pursuant to the § 2C1.1(c)(1) cross-reference because he "could not be properly charged with or convicted of 'another criminal offense.'" Solomon Br. 14. Specifically, he contends

---

[1] The District Court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291.

that he "could not properly be charged with intent to distribute or distribution of a controlled substance, because that offense requires that the defendant distribute actual drugs or possess with the intent to distribute actual drugs." *Id.* The drug deals in Solomon's case were staged by the Government, using fake drugs. Solomon also claims the cross-reference should not apply because he could not properly be charged with a drug distribution conspiracy since "all of the other participants in the purported conspiracy were government agents." *Id.* Thus, he argues, there was no "other offense" and no conspiracy.

Solomon's arguments on this issue fail because they run contrary to the clear language of the Guidelines. He pleaded guilty to three counts of extortion under color of official right, a crime covered by Part C of the Guidelines ("Offenses Involving Public Officials and Violations of Federal Election Campaign Laws"). The applicable Guideline sets a base offense level of 14 for any defendant who was a public official, § 2C1.1(a), and also increases the offense level if certain characteristics are present, such as more than one bribe or extortion. § 2C1.1(b). It then lists the cross-reference at issue in this appeal, which reads:

> If the offense was committed *for the purpose of facilitating the commission of another criminal offense*, apply the offense guideline applicable to a conspiracy to commit that other offense, if the resulting offense level is greater than that determined above.

§ 2C1.1(c)(1) (emphasis added). According to Application Note 5, "resulting offense level" means "the final offense level (i.e., the offense level determined by taking into account

8

both the Chapter Two offense level and any applicable adjustments from Chapter Three, Parts A-D.)" The Background Commentary to § 2C1.1(c)(1) adds: "For example, if a bribe was given to a law enforcement officer to allow the smuggling of a quantity of cocaine, the guideline for conspiracy to import cocaine would be applied if it resulted in a greater offense level."

The Guidelines thus plainly do not require that the defendant could have been charged with "another criminal offense"—only that the *purpose* of the bribe or extortion was to facilitate the commission of another crime. This critical distinction refutes Solomon's argument. The Government does not contend, nor do the Guidelines require, that Solomon *actually* facilitated another criminal offense. Rather, he pleaded guilty to receiving illegal payments and taking actions that he *thought* were furthering cocaine trafficking. This doubly corrupt purpose—as opposed to, for instance, a public official accepting payments in exchange for taking an otherwise legal action—explains why the Guidelines provide for increased punishment of defendants covered by the cross-reference.

The few appellate courts that have considered the applicability of the cross-reference have reached the same conclusion we reach today. In *United States v. Ruiz*, the Court of Appeals for the Fifth Circuit held that the cross-reference applied to a Border Patrol agent who accepted payments for protecting a cocaine deal that turned out to be a sting operation. 621 F.3d 390, 392–93 (5th Cir. 2010) (per curiam). Like Solomon, Ruiz challenged the cross-reference by arguing that he could not have entered into a conspiracy with government agents. *Id*. at 393–94. The Fifth Circuit disagreed, noting that "because Ruiz took bribes to facilitate

9

the smuggling of cocaine, his offense falls squarely under the scenario the [Guideline Background] describes." *Id.* at 395. *Ruiz* was consistent with previous decisions of panels of the Fifth Circuit. *See United States v. Williams*, 332 F. App'x 937, 939–40 (5th Cir. 2009) ("The predicate for application of § 2C1.1(c)(1) is not the existence of a conspiracy, but rather that the purpose of the offense was to facilitate the commission of another criminal offense."); *United States v. Carr*, 303 F. App'x 166, 169 (5th Cir. 2008) ("[T]he issue of whether a conspiracy between Carr and the informant was legally impossible does not affect the applicability of the cross reference. By its plain language, § 2C1.1(c)(1) requires only that the primary offense be committed 'for the purpose of facilitating' another offense. . . . USSG § 2C1.1(c)(1) does not by its language or stated purpose require that the elements of conspiracy be established.").

Like the Fifth Circuit, a panel of the Fourth Circuit reached much the same conclusion, writing that "[a] defendant may be sentenced under § 2C1.1(c)'s cross-reference provision for a fictitious crime created via a sting operation," including based on the fictitious amount of "drugs" involved. *United States v. Brannen*, 145 F.3d 1326 (table), 1998 WL 230823, at *2 (4th Cir. May 11, 1998); *cf. United States v. Shenberg*, 89 F.3d 1461, 1474–75 (11th Cir. 1996) (affirming sentence under cross-reference when defendant provided information under belief that it would result in murder).

Solomon makes a policy argument that sentencing him as a cocaine trafficker thwarts the Guidelines' intent to balance a defendant's actual conduct with his charged

conduct. U.S.S.G. Ch. 1, Pt. A, Policy Statement 4(a).[2] According to Solomon, applying the cross-reference causes him to be sentenced for neither his real offense nor his charged offense. Rather, he was sentenced as if he committed conspiracy to commit cocaine trafficking, an offense he could not have committed on these facts despite being charged with violating the Hobbs Act. This did not stop the Fifth Circuit from applying the cross-reference in *Ruiz*, or its panels from doing so in *Williams* and *Carr*, but Solomon attempts to distinguish his case by arguing that the Fifth Circuit did not consider his policy argument. He additionally notes that *Shenberg*, *Brannen*, and *United States v. Burke*, 431 F.3d 883 (5th Cir. 2005), involved actual conspiracies. Even conceding that Solomon's case is different, however, his argument runs headlong into the text of the cross-reference, which says nothing about whether other conduct could have been charged and certainly does not require it. Moreover, the cross-reference is *part* of the Hobbs Act sentencing Guideline.

---

[2] See also *United States v. Baird*, 109 F.3d 856, 869 (3d Cir. 1997):

> The Guidelines are, at bottom, a modified real offense system . . . . More specifically, they are a mix of a charge offense system and a pure real offense system in that it bases a sentence on both the formal offense of conviction and on the actual conduct of the defendant. . . . Therefore, it is clear that the Guidelines envisioned that sentencing courts would consider at least some conduct for which a defendant was not actually charged.

11

We recognize Solomon's understandable frustration with receiving a significantly higher sentence based on a quantity of fake drugs determined at the discretion of the Government. Had "Joseph" asked Solomon to "provide protection" for a shipment involving only 1 kilogram of cocaine, for instance, Solomon's offense level would have been 27 and his Guidelines range 70 to 87 months, a little more than half his actual Guidelines range. Then-Chief Judge Edith Jones addressed this concern in *Williams*, which was factually similar to Solomon's case. There, Williams twice agreed to "escort a shipment of cocaine as it passed through the county in exchange for cash payments from an undercover agent." 332 F. App'x at 938. He believed the first shipment contained 5 kilograms and the second 10 kilograms. *Id*. Like Solomon, Williams had no previous criminal record. *Id*. A panel of the Fifth Circuit affirmed the application of the cross-reference in a per curiam opinion. *Id*. In a footnote, Judge Jones agreed that the sentence "must be affirmed under applicable law," but also opined that she "strongly believe[d] that the government miscarried justice by insisting" that Williams "be sentenced . . . on the basis of contrived amounts of non-existent cocaine." *Id*. at 937 n.1.

Although we have not spoken to the issue, other courts have raised similar concerns about the potential for government manipulation of the Guidelines range in reverse sting operations. *See United States v. Sed*, 601 F.3d 224, 229–30 (3d Cir. 2010). However, for purposes of Solomon's appeal, we note that the Guidelines address the reverse-sting context by focusing on the agreed-upon amount of the controlled substance to determine the quantity of drugs involved for sentencing purposes. § 2D1.1 cmt. 5. While it is true that the Government suggested specific quantities of

cocaine, it is also true that Solomon willingly acceded to the plan at a time when he still believed real drugs were involved. *See Brannen*, 1998 WL 230823 at *1 ("Although [the quantity of drugs] was suggested by the informant, Brannen never objected or requested that the informant reduce the quantity.").

Solomon next contends that even if he did commit extortion for the purpose of committing another criminal offense, that offense would be conspiracy with intent to distribute a controlled substance, meaning that under the cross-reference the District Court would sentence him for conspiracy to commit conspiracy to distribute drugs—a nonexistent "double inchoate crime." Solomon Br. 16. We are unpersuaded. The facts make clear that Solomon accepted payments with the intent to facilitate cocaine trafficking. Therefore, we "apply the offense guideline applicable to a conspiracy to commit [cocaine trafficking]." § 2C1.1(c)(1). This is so because agreeing to accept an illegal payment to facilitate another crime is akin to joining a conspiracy to commit that crime and can be punished accordingly. The example provided in the Guidelines Background—"if a bribe was given to a law enforcement officer to allow the smuggling of a quantity of cocaine, the guideline for conspiracy to import cocaine would be applied"[3]—only reinforces our interpretation.

Nor is Solomon correct that if any cross-reference encompassed his conduct, it was § 2C1.1(c)(2), which applies "[i]f the offense was committed for the purpose of concealing, or obstructing justice with respect to, another criminal offense." Although Solomon asked the CI for

---

[3] § 2C1.1 Commentary, Background.

advance notice of the transaction so he could assign other officers away from the meeting place, his conduct was more akin to "facilitation" than "concealment" or "obstruction." Facilitation is prospective; the defendant accepts payments to further the commission of a crime, which is what happened here. By contrast, concealment and obstruction are retrospective, and apply after a crime has already occurred and the defendant accepts payments to cover it up or to impede an ongoing investigation. *See, e.g., United States v. Pompey*, 17 F.3d 351, 352–53 (11th Cir. 1994) (bribe paid to law enforcement officials to drop cocaine charges "was for the purpose of obstructing justice in another criminal offense" such that Guidelines cross-reference could apply).

Finally, we decline Solomon's request to apply the rule of lenity, because the language of § 2C1.1(c)(1) is not ambiguous. Solomon argues that the Guidelines do not define "another criminal offense," leaving it unclear "whether [it] means an actual offense for which a defendant could have been properly charged or convicted, or something else." Solomon Br. 20. Again, the Guidelines state that for the cross-reference to apply, the defendant must accept payments "for the purpose of facilitating the commission of another criminal offense." § 2C1.1(c)(1). The key word is "purpose"—*i.e.*, the reason the defendant accepted the payments. Regardless of whether Solomon could be *charged* with conspiracy to traffic cocaine, he knew he was accepting money to further what he believed to be a drug transaction— "another criminal offense" above and beyond Hobbs Act extortion. This is not ambiguous; it is easily distinguishable from conduct that would not qualify, such as if Solomon had accepted a payment to write a parking ticket that he could have written legally. Accordingly, the cross-reference applies

14

to Solomon's conduct and the fact that the Guideline is susceptible to criticism on policy grounds does not render it ambiguous. The District Court did not err in this regard.

B

Solomon also challenges the District Court's application of the 2-level enhancement for abuse of a position of trust, § 3B1.3,[4] which increased his Guidelines range from 108–135 months to 135–168 months. He argues that the enhancement cannot apply to sentences originating under § 2C1.1—even those, like his, with a Guidelines range ultimately determined pursuant to a cross-reference. The Government disagrees, contending that the enhancement applies because once the cross-reference was triggered, Solomon was actually sentenced under § 2D1.1. In light of the language, context, and history of the Guidelines at issue, we believe Solomon has the better of the argument.

Although our consideration of this issue requires careful analysis of several relevant Guidelines, the parties' dispute essentially boils down to one question: was Solomon sentenced *exclusively* under § 2D1.1? If so, then there is no impediment to the application of the abuse of trust enhancement against him. Viewed in a vacuum, § 3B1.3 would apply to Solomon because it is not "included in the

---

[4] "If the defendant abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels. This adjustment may not be employed if an abuse of trust or skill is included in the base offense level or specific offense characteristic."

15

base offense level or specific offense characteristic" of the cross-reference (§ 2D1.1) that applies to him. But Application Note 6 to § 2C1.1, the Guideline governing Solomon's convictions, states: "Do not apply § 3B1.3 (Abuse of Position of Trust or Use of Special Skill)." This prohibition apparently accounts for the fact that § 2C1.1 already provides a 2-level increase if the defendant was a public official and allows the court to apply an even higher offense level—through the § 2C1.1(c)(1) cross-reference—if that official solicited or received payments "for the purpose of facilitating the commission of another offense."

To understand how these two provisions interact in this case, we must carefully look to Guidelines language governing cross-references. As noted previously, § 2C1.1(c)(1) directs a court to "apply the offense guideline applicable to conspiracy to commit [another] offense . . . if the resulting offense level is greater than that determined [under the ordinary Hobbs Act guidelines]." However, a court cannot make that comparison without ascertaining the other offense level and determining how it should be calculated. Here, "the 'resulting offense level' means the final offense level (*i.e.*, the offense level determined by taking into account both the Chapter Two offense level *and* any applicable adjustments from Chapter Three, Parts A-D)." § 2C1.1, Application Note 5 (emphasis added). How does the sentencing judge determine *which* Chapter Three adjustments are applicable? According to Guidelines General Application Principle § 1B1.5(c),[5] they are "determined in respect to the

---

[5] Part of Guidelines section § 1B1.5, "Interpretation of References to Other Offense Guidelines."

referenced offense guideline, *except as otherwise expressly provided.*" (emphasis added).

The parties here diverge over the meaning of "except as otherwise expressly provided." In Solomon's view, Application Note 6 of § 2C1.1 is exactly the kind of express prohibition the Guidelines contemplate. It plainly and without exception forbids application of the abuse of trust enhancement. To the Government, however, "except as otherwise expressly provided" actually means "except as otherwise expressly provided *in the cross-referenced Guideline.*" Under this reading, § 2C1.1's prohibition is irrelevant to the calculation of Solomon's offense level under the cocaine trafficking Guideline, because that occurs under § 2D1.1, which does not forbid a court from applying the abuse of trust enhancement.

The parties' disagreement requires us to determine whether § 2C1.1's express prohibition on applying the abuse of trust enhancement extends to offense levels calculated under the cross-reference, which necessarily implicates other Guidelines. For several reasons, we conclude that it does.

First, this result makes sense under an order-of-operations approach. To determine whether the Hobbs Act offense level is higher or lower than that "applicable to conspiracy to commit [the other] offense," the sentencing judge must calculate the offense level under the cross-referenced Guideline and then compare it to the ordinary Hobbs Act offense level, relying on the language of the § 2C1.1(c)(1) cross-reference. In doing so, the court cannot apply an offense level stemming from another Guideline *without* referring back to the language of § 2C1.1, the Guideline under which the sentence originates, including

17

Application Note 6. In addition, by the time the court makes the comparison, it will have already calculated both possible outcomes, so no further enhancements can apply.

Stated another way, Application Note 6's prohibition of the abuse of trust enhancement is effective because the sentencing court never abandons § 2C1.1. There is a difference between determining an offense level by reference to another Guideline and transferring out of one's original Guideline altogether. Even if a defendant ultimately receives an increased offense level under the cross-reference, as Solomon did, he is still sentenced under § 2C1.1—the Guideline governing his offense of conviction—even though his offense level is undoubtedly driven by § 2D1.1, courtesy of the cross-reference.

The plain language of the Guidelines also supports Solomon's argument. Section 1B1.5(c) states that in cross-reference cases, Chapter Three adjustments "are determined in respect to the referenced offense guideline, *except as otherwise expressly provided*." Here, § 2C1.1 contains an express provision, Application Note 6, stating that a specific Chapter Three adjustment (the abuse of trust enhancement) does not apply. We cannot ignore this, particularly because the Government does not point to other Guidelines language that supports an alternative interpretation or indicates that a sentencing court abandons § 2C1.1 when applying the cross-reference. Instead, the Government simply urges us to limit the reach of "except as otherwise expressly provided" and read Application Note 6 as applying only to offense levels calculated under § 2C1.1, not those that use the cross-reference. We are more persuaded by Solomon's view because Application Note 6 simply states: "Do not apply § 3B1.3 (Abuse of Position of Trust or Use of Special Skill)."

It does not allow for any exceptions. Therefore, we believe it encompasses sentences that rely on the cross-reference to determine the offense level.

The history of § 2C1.1 also bolsters our conclusion, because before November 2004 the relevant application note *did* contain an exception for cases in which the offense level was determined under a cross-reference. It stated:

> Do not apply § 3B1.1 (Abuse of Position of Trust or Use of Special Skill), except where the offense level is determined under § 2C1.1(c)(1), (2), or (3). *In such cases, an adjustment from § 3B1.1 (Abuse of Position of Trust or Use of Special Skill) may apply*.

§ 2C1.1, Application Note 3 (2003) (emphasis added). Amendment 666, a November 2004 revision of the public corruption Guidelines, changed the language to its current form: "Do not apply § 3B1.3 (Abuse of Position of Trust or Use of Special Skill)." Although the "Reason for Amendment" section of Amendment 666 does not explain why the language was changed, it would be improper for us to give no effect to the Sentencing Commission's amendment. *See, e.g., Nyhuis v. Reno*, 204 F.3d 65, 72 (3d Cir. 2000) ("In interpreting [an] alteration in [statutory] language, we must presume, as always, that th[e] amendment was intended to have 'real and substantial effect.'" (quoting *Stone v. I.N.S.*, 514 U.S. 386, 397 (1995))). Under the Government's reading, Solomon would lose under both the prior and current versions, even though the Guideline once provided for application of the enhancement in cross-reference cases and

no longer does. We cannot accept the Government's tacit insistence that the amendment does no work.[6]

---

[6] Contrary to the dissent's contention, our interpretation of the revised cross-reference comports with Amendment 666's stated purpose of "increas[ing] punishment for bribery, gratuity, and 'honest services' cases" *and* accounts for a defendant's status as a public official. This is so because the cross-reference applies only if the offense level under the cross-referenced Guideline is higher than the § 2C1.1 offense level, which already takes public official status into account. Prior to Amendment 666, § 2C1.1 set the base offense level at 10 for all defendants. Amendment 666 increased the base offense level to 14 for public officials, compared to 12 for all other defendants. Thus, the revised Guideline already includes a two-level increase for public officials. This helps explain why the abuse of trust enhancement no longer applies when the cross-reference is used—it is incorporated into the base offense level instead.

Similarly, it is incorrect to state, as the dissent does, that absent the abuse of trust enhancement, "the offense level [under the cross-reference] would be the same as if a member of the general public had committed this cross-referenced crime." This elides the distinction between a sentence under the § 2C1.1 cross-reference and a sentence directly under § 2D1.1. Had Solomon been convicted of cocaine trafficking, his offense level would have been determined directly under § 2D1.1, and he would have been eligible for the abuse of trust enhancement. But he was convicted of violating the Hobbs Act. Consequently, his sentence should not be compared to one imposed upon a defendant who *actually* committed a drug offense.

The Government correctly notes that the amended language did not stop a panel of the Fifth Circuit from concluding that the enhancement could still apply in cross-reference cases. *See United States v. Carr*, 303 F. App'x 166 (5th Cir. 2008). Indeed, the District Court also looked to *Carr*, which appears to be the only case to take up this issue based on the current Guidelines language, in applying the enhancement to Solomon's sentence. In *Carr*, the panel acknowledged the changed language of the § 2C1.1 application note, but declared conclusorily that it "does not warrant a different result" than that reached in cases under the previous language. *Id*. at 170. Although the panel noted § 1B1.5(c)'s "except as otherwise expressly provided" language on applying Chapter Three adjustments, it did not analyze it or otherwise proceed as if it might apply. Instead, it merely stated that the application notes to § 2C1.1 do not apply "once the offense level is determined pursuant to the cross-referenced guideline." *Id*. at 171.

For the reasons noted already, we are convinced that *Carr* got the timing wrong. A court can apply the cross-reference—and thus, rely on a different Guidelines range to sentence a defendant—only *after* calculating the offense level under both § 2C1.1 and the cross-referenced Guideline (here, § 2D1.1), *including* "any applicable enhancements" (§ 2C1.1, Application Note 5) and determining which is higher. Here, the District Court calculated the final offense level under § 2C1.1 and concluded it was 19. It then stated that "the guideline computations related to . . . drug distribution[] produces the higher overall offense level" and that "[a]ccordingly, the guideline computations will be calculated under U.S.S.G. § 2D1.1." A3. In this case, that would be true regardless of when any applicable enhancements were

21

applied, but the Guidelines nonetheless direct the court to calculate the sentence under the cross-referenced Guideline, including enhancements, *before* determining whether to use the offense level under § 2C1.1 or the cross-reference. These calculations and analyses all take place pursuant to § 2C1.1, which prohibits the application of the abuse of trust enhancement. Arguing that Solomon was "not sentenced under [§ 2C1.1] because of the application of the cross reference," as the Government does, is thus not entirely accurate. Solomon's final Guidelines range was determined by the higher offense level of § 2D1.1, but he was sentenced pursuant to § 2C1.1, the Guideline applicable to his crime of conviction.

We thus conclude that Application Note 6's express prohibition on the abuse of trust enhancement applies to any sentence originating under § 2C1.1, even those that ultimately apply the offense level for another Guideline pursuant to the cross-reference. Because we conclude the District Court erred in applying the abuse of trust enhancement, we must remand for resentencing, as on this record we "cannot presume [the District Court] would have imposed the same sentence, given the opportunity to consider the correctly calculated Guideline." *United States v. Langford*, 516 F.3d 205, 217 (3d Cir. 2008). Of course, we leave to the District Court's discretion the determination of an appropriate sentence in light of the corrected Guidelines range of 108 to 135 months.

\* \* \*

For the foregoing reasons, we will affirm the District Court's application of the cross-reference but reverse its application of the abuse of trust enhancement. We therefore

vacate Solomon's sentence and remand for resentencing in accordance with this opinion.

*United States v. Solomon*

No. 13-3108

_____


ROTH, <u>Circuit Judge</u>, dissenting:

Although I agree with the majority that the District Court properly applied the cross reference in § 2C1.1(c)(1), I do not believe that the application notes in § 2C1.1 precluded the District Court from applying an adjustment for breach of trust pursuant to § 3B1.3. Rather, I would hold that sentences calculated pursuant to a cross reference are not limited by the restrictions on adjustments applicable to the original Guideline, unless the Guidelines expressly make those restrictions applicable when using a cross reference.[1] I therefore respectfully dissent.

Solomon was eligible to receive a § 3B1.3 adjustment for abuse of trust because his sentence was calculated pursuant to § 2D1.1, not § 2C1.1. The Guidelines instruct that "[i]f the offense level is determined by a reference to another guideline . . . the adjustments in Chapter Three (Adjustments) also are determined in respect to the referenced

_____

[1] As the majority notes, a panel of the Fifth Circuit, in a non-precedential opinion, has reached the same conclusion. *United States v. Carr*, 303 F. App'x 166 (5th Cir. 2008). In a later precedential opinion, the Fifth Circuit has also affirmed application of an abuse-of-trust increase when applying the cross reference in § 2C1.1(c)(1). *See United States v. Ruiz*, 621 F.3d 390 (5th Cir. 2010).

offense guideline, except as otherwise expressly provided." *Id.* § 1B1.5(c). Section 2C1.1 does not "expressly provide[]" that the sentencing court must not apply an adjustment for abuse of trust pursuant to § 3B1.3 *when imposing a sentence through the cross reference in § 2C1.1(c)(1). Id.* Rather it states, in full, "Inapplicability of §3B1.3.—Do not apply § 3B1.3 (Abuse of Position of Trust or Use of Special Skill)." *Id.* § 2C1.1, cmt. n.6. Although this language plainly bars application of § 3B1.3 when the sentence is calculated pursuant to § 2C1.1, it is silent as to whether the ban on an abuse-of-trust adjustment applies when a cross reference is used. As such, it does not "expressly provide[]" that Chapter Three adjustments are not to be determined in respect to the referenced offense guideline. *Id.* § 1B1.5(c); *see Elliott v. Archdiocese of N.Y.*, 682 F.3d 213, 225–26 (3d Cir. 2012) (defining "express" as "directly and distinctly stated or expressed rather than implied or left to reference" (quoting *Webster's Third New International Dictionary* 803 (Merriam–Webster 1986)).

When compared to other Guidelines, it becomes even more evident that § 2C1.1 does not expressly limit sentencing courts from applying an abuse-of-trust adjustment when the cross reference applies. Section 2K1.4(c), to take one example, directs courts sentencing a defendant who is determined to be a career offender on certain firearms charges to determine the guideline sentence by reference to § 4B1.1. In addition, § 2K2.4(c) expressly provides that, with certain exceptions, "Chapters Three and Four shall not apply to that count of conviction." U.S.S.G. § 2K1.4(c). Unlike § 2K1.4(c), neither § 2C1.1(c) nor its application notes contain such express language precluding application of an abuse-of-trust adjustment when a cross reference is applied.

2

Simple logic also compels this result. Section 2C1.1 is unusual in that it directs the sentencing court to consider *both* the Chapter Two offense level *and* any applicable adjustments from Chapter Three when calculating the "greater offense level" for purposes of determining whether to apply a cross reference. *See id.* § 1B1.5(d). If the limitations on Chapter Three adjustments applied equally to sentences calculated under § 2C1.1 directly and those under the cross reference, there would be no reason to consider Chapter Three adjustments at this stage. The Chapter Three adjustments would always be the same for both calculations and consideration of those adjustments would not add anything to the base offense level as determined by Chapter Two.

The fact that the relevant application note previously expressly indicated that an abuse-of-trust adjustment might apply when a sentence is calculated by cross reference should not change this result. As an initial matter, we should not consider the application note's history because the plain meaning of the relevant Guidelines is conclusive. *See In re Armstrong World Indus., Inc.*, 432 F.3d 507, 512 (3d Cir. 2005) ("If the meaning is plain, we will make no further inquiry unless the literal application of the statute will end in a result that conflicts with Congress's intentions.").

Even considering the fact that the Guideline was amended, however, Amendment 666 does not support Solomon's argument. The "Reason for Amendment" indicates that it was adopted to "increase[] punishment for bribery, gratuity, and 'honest services' cases while providing additional enhancements to address previously unrecognized aggravating factors inherent in some of these offenses."

3

U.S.S.G. app. C amend. 666 (Supp. 2004). To accomplish this end, the Sentencing Commission streamlined several previously dispersed Guidelines and provided higher alternative base offenses levels for public officials who abuse positions of public trust. *Id.* It would be odd in the extreme for the Sentencing Commission to have sought to increase the sentences of corrupt public officers by eliminating the use of a sentencing increase for abuse of trust when a cross reference applies. The cross-referenced Guideline would not account for the defendant's status as a public official, and the offense level would be the same as if a member of the general public had committed this cross-referenced crime.[2] A sentencing court's failure to apply § 3B1.3 would essentially ignore the defendant's abuse of a position of trust despite the Sentencing Commission's stated view that "offenders who abuse their position of public trust are inherently more culpable than" other offenders. *Id.* In contrast to this language, there is no indication in the Sentencing Commission's "Reason for Amendment" that supports the majority's view. It is far more reasonable to conclude that the

---

[2] The majority asserts that the cross-reference accounts for a defendant's public official status because § 2C1.1 now sets the base offense level two levels higher for public officials as compared to other defendants. That increase, however, does not apply to drug crimes sentenced pursuant to § 2D1.1 or any other offense guideline that would be cross referenced. Because the original and cross-referenced guidelines are calculated separately and then compared to determine which produces the higher resulting offense level, under the majority's view the defendant's public official status would not be accounted for at any point in calculating the result of applying a cross reference.

4

Sentencing Commission merely deleted language it thought was superfluous from the relevant application note.

Because I believe the District Court committed no error in applying a sentencing adjustment for abuse of a position of trust pursuant to § 3B1.5, I respectfully dissent.