PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

Nos. 12-1145 and 13-1491

_____

UNITED STATES OF AMERICA

v.

KENNETH SCHNEIDER,
Appellant

_____

On Appeal from United States District Court
for the Eastern District of Pennsylvania
(E.D. Pa. No. 2-10-cr-00029-001)
District Judge:  Honorable Juan R. Sanchez

_____

Argued January 20, 2015
Before:  FISHER, JORDAN and GREENAWAY, JR., *Circuit
Judges*.

(Filed: September 9, 2015)


Howard J. Bashman, Esq.  ***ARGUED***
Suite G-22

2300 Computer Avenue
Willow Grove, PA 19090
     *Counsel for Appellant*

Vineet Gauri, Esq.
Michelle Morgan, Esq.  **ARGUED**
Daniel A. Velez, Esq.
Office of United States Attorney
615 Chestnut Street
Suite 1250
Philadelphia, PA 19106
     *Counsel for Appellee*

———

OPINION OF THE COURT

———

FISHER, *Circuit Judge*.

     These appeals concern the criminal conviction of Kenneth Schneider on the charge of traveling in foreign commerce with the intent to engage in sex with a minor between the ages of twelve and sixteen, in violation of 18 U.S.C. § 2423(b) (2000). They pose questions involving pre- and post-trial motions, evidentiary issues, and a sentencing issue, each of which Schneider asserts was incorrectly decided by the District Court. Because the District Court did not err or abuse its discretion, we will affirm each of these rulings.

## I.

The victim in this case was born in Russia in 1986. At age ten, he was sent to study ballet at the Bolshoi Academy in Moscow, approximately three hours from his family's house. Within a year and a half, the victim's parents owed the Academy just under $500 for unpaid dormitory fees. Those unpaid fees prevented him from continuing to attend the Academy. In 1998, two of the victim's ballet teachers introduced Kenneth Schneider, an American lawyer who had lived in Moscow for many years, to the victim and his family. Schneider had previously been financially generous in supporting artists in Russia. The teachers told Schneider about the victim's circumstances, and Schneider indicated that he might be able to help.

One day that summer, Schneider and the instructors went to the victim's house for a ballet demonstration. During the demonstration, one of the teachers commented to Schneider that the victim was very talented. After subsequent meetings, Schneider agreed to financially assist the victim's parents so that the victim could pursue further ballet studies at the Academy. Schneider proposed to pay for the victim's studies and housing, and extended the victim's father a loan to pay the delinquent dormitory fees. Schneider, with the victim's parents' permission, had the victim live at his Moscow apartment, close to the Academy. The victim was twelve years old when he began living with Schneider during the week.

At some point, Schneider began engaging in sexual activity with the victim. As of August 2000, Schneider and the victim were engaging in oral sex on Schneider's bed approximately three times per week. Thereafter, Schneider and the victim moved to a second apartment near the Academy. At this point, Schneider and the victim were also

engaging in anal sex, with sexual activities occurring approximately three to four times per week. Near this time, a school nurse examined the victim. Schneider told the victim that if the nurse asked questions about the condition of the victim's anus, the victim should tell her that he had been using a solid stick of hemorrhoid medication. Schneider told the victim that if anyone discovered their sexual activity, Schneider would go to jail and the victim would not achieve his goals of becoming a famous ballet dancer or going to America. Around this time, Schneider showed the victim a movie about a famous male ballet dancer and his older male mentor and lover, and compared their relationship to the one in the film.

In 2001, when the victim was fifteen, he, with assistance from Schneider, applied to and was accepted into a summer ballet program in Philadelphia. The victim's parents agreed to let him attend. The victim and Schneider traveled together to Philadelphia, where the victim resided at Schneider's parents' home while attending the program. Schneider did not stay in Philadelphia the entire time, as he was traveling for work. During this time in the United States, Schneider and the victim held hands, hugged, and kissed on the lips, but no oral or anal sex occurred. On August 22, 2001, Schneider and the victim returned together to Moscow.

Upon their return, the victim returned to living at Schneider's apartment, and Schneider and the victim resumed engaging in oral and anal sex. When the victim was sixteen, Schneider and the victim moved to Massachusetts, where the victim attended school and danced professionally. In 2008, the victim filed a civil complaint against Schneider and members of Schneider's family, among others, alleging that Schneider had sexually abused the victim for years.

That civil suit was stayed in December 2009 when Schneider was charged in a criminal complaint. In January 2010, a federal grand jury returned an indictment against Schneider, charging him with traveling in foreign commerce for the purpose of engaging in illicit sexual conduct with another person, in violation of 18 U.S.C. § 2423(b) (2000), and transporting an individual in foreign commerce with intent that such individual engage in a sexual activity for which any person can be charged with a criminal offense, in violation of 18 U.S.C. § 2421 (2000). These charges related to the victim and Schneider's travel from Philadelphia to Moscow on August 22, 2001. On March 27, 2010, Schneider was arrested in Cyprus. After two days in custody, he was released on bail, and subsequently returned to custody just under two months later, on May 17, 2010. On May 28, 2010, Schneider was brought to the Federal Detention Center in Philadelphia, remaining there through his trial.

The trial commenced on September 21, 2010. On October 1, 2010, a jury found Schneider guilty on both counts. Schneider subsequently moved for a judgment of acquittal, which the District Court granted as to the § 2421 count, but not the § 2423(b) count. Schneider was sentenced on December 1, 2011, to the statutory maximum fifteen years' incarceration, in addition to three years' supervised release, a $20,000 fine, and $35,000 in restitution. Schneider timely appealed. On August 12, 2012, Schneider filed a timely motion for a new trial based on newly-discovered evidence. The District Court denied this motion on February 15, 2013, and Schneider timely appealed. Those appeals have been consolidated before us.

## II.

The District Court had jurisdiction pursuant to 18 U.S.C. § 3231. This Court has jurisdiction pursuant to 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291.

## III.

Schneider raises six issues on appeal. First, did the District Court err when it denied Schneider's motion for a judgment of acquittal for his conviction under 18 U.S.C. § 2423(b)? Second, did the District Court err when it denied Schneider's motion to dismiss the indictment as barred by the statute of limitations? Third, did the District Court abuse its discretion in ruling evidence of Schneider's pretrial incarceration inadmissible? Fourth, did the District Court abuse its discretion in admitting excerpts of and testimony regarding a film into evidence? Fifth, did the District Court abuse its discretion when it did not grant a motion for a new trial based on newly-discovered evidence? Finally, did the District Court err when it invoked a Sentencing Guidelines cross-reference to calculate Schneider's final offense level? We consider each issue in turn.

A.

Schneider, in a post-trial motion, sought a judgment of acquittal on both counts. App. at 18. The District Court granted this motion in part, writing that the "innocent round trip" exception established in *Mortensen v. United States*, 322 U.S. 369 (1944), a prosecution under the Mann Act, ch. 395, 36 Stat. 825 (1910) (codified as amended at 18 U.S.C. §§ 2421-2424 (2012)), applied to the 18 U.S.C. § 2421 conviction. It went on to deny Schneider a judgment of acquittal in connection with his conviction under 18 U.S.C. § 2423(b), stating that the *Mortensen* exception did not apply to that conviction. Schneider appeals the latter ruling.

"An appeal from a denial of a motion for judgment of acquittal is subject to [de novo] review, where the question is one of statutory interpretation." *United States v. Schneider*, 14 F.3d 876, 878 (3d Cir. 1994). We will affirm if "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 424-25 (3d Cir. 2013) (en banc) (internal quotation marks omitted).

**1. Mann Act precedent's application to 18 U.S.C. § 2423(b)**

Schneider argues on appeal that application of the "innocent round trip" exception, first set out in *Mortensen*, should result in a reversal of the District Court's denial of his motion for a judgment of acquittal on the § 2423(b) charge. Whether Mann Act precedent applies to prosecutions under § 2423(b) is an issue of first impression in this Circuit.

"The statutory antecedents of § 2423(b) date back to the Mann Act, enacted in 1910. Section 2423 evolved from the same legislative initiative as the Mann Act, and both are . . . components of the same general legislative framework."

7

*United States v. Garcia-Lopez*, 234 F.3d 217, 220 n.3 (5th Cir. 2000) (citation omitted). "Section 2421 is the original Mann Act, as amended in minor respects. . . . Section 2423(b), the provision under which the defendant was prosecuted, was added to expand the protection of minors still further; it punishes travel in interstate commerce even if no minor is transported, if the purpose of the travel is sex with a minor." *United States v. McGuire*, 627 F.3d 622, 624 (7th Cir. 2010).

In 1997, the Seventh Circuit noted that "[j]udicial interpretations of the Mann Act necessarily color our reading of § 2423(b)." *United States v. Vang*, 128 F.3d 1065, 1069 (7th Cir. 1997). It concluded that:

> [Section] 2423(b) and the Mann Act are part of the same general legislative framework. More importantly, the crucial language of § 2423(b) employs the same "for the purpose of" phrase used in the original Mann Act and construed by the Supreme Court and a number of lower courts. . . . [Furthermore, t]he familial relationship between § 2423(b) and the Mann Act suggests that Congress intended the same meaning for identical phrases in the two statutes.

*Id.* at 1069, 1070 n.6. The Fifth Circuit has noted that "early cases interpreting the original Mann Act are authoritative in construing § 2423(b)." *Garcia-Lopez*, 234 F.3d at 220 n.3. We agree, so we proceed on the basis that Mann Act precedent such as *Mortensen* is instructive and persuasive in § 2423(b) cases.

**2. The "innocent round trip" exception to the Mann Act**

8

Next, we consider whether the *Mortensen* "innocent round trip" exception should be extended from prosecutions under § 2421 to those under § 2423(b). *Mortensen* involved a husband and wife who jointly operated a "house of prostitution" in Grand Island, Nebraska. 322 U.S. at 372. In 1940, they planned a car trip to Salt Lake City, Utah, to visit the wife's parents. *Id.* Two women who were employed by the Mortensens as prostitutes "asked to be taken along for a vacation and the Mortensens agreed to their request." *Id.* On this vacation, they drove to and visited Yellowstone National Park and Salt Lake City. They visited Mrs. Mortensen's parents, went to shows and parks, and visited other parts of the city. *Id.* Upon completing the trip, they all returned together to Grand Island, where the two women subsequently returned to working as prostitutes. *Id.* Importantly, "[n]o acts of prostitution or other immorality occurred during the two-week trip and there was no discussion of such acts during the course of the journey." *Id.* The women were not obligated to return to Grand Island to work for the Mortensens and were free at any time to leave their jobs for other pursuits. *Id.* at 372-73.

The Mortensens were subsequently charged with two violations of the Mann Act—that they "aided and assisted in obtaining transportation for and in transporting, two girls in interstate commerce from Salt Lake City to Grand Island for the purpose of prostitution and debauchery." *Id.* at 373. The Supreme Court noted that any "intention that the women or girls shall engage in the conduct outlawed by [the Mann Act] must be found to exist before the conclusion of the interstate journey and must be the dominant motive of such interstate movement. And the transportation must be designed to bring about such result." *Id.* at 374. It ultimately held that the trip was not taken with such an intent, but rather that "[i]t was a

9

complete break or interlude in the operation of petitioners' house of ill fame and was entirely disassociated therefrom." *Id.* at 375. In a crucial section of the opinion, the Supreme Court wrote that:

> The fact that the two girls actually resumed their immoral practices after their return to Grand Island does not, standing alone, operate to inject a retroactive illegal purpose into the return trip to Grand Island. Nor does it justify an arbitrary splitting of the round trip into two parts so as to permit an inference that the purpose of the drive to Salt Lake City was innocent while the purpose of the homeward journey to Grand Island was criminal. The return journey under the circumstances of this case cannot be considered apart from its integral relation with the innocent round trip as a whole. There is no evidence of any change in the purpose of the trip during its course. If innocent when it began it remained so until it ended. Guilt or innocence does not turn merely on the direction of travel during part of a trip not undertaken for immoral ends.

*Id.* This language gave birth to what has become known as the "innocent round trip" exception to § 2421. *See, e.g., Forrest v. United States,* 363 F.2d 348, 350 n.1 (5th Cir. 1966); *United States v. Nichol,* 323 F.2d 633, 634 (7th Cir. 1963). Schneider invokes this exception here and argues that it should apply to his conviction under § 2423(b). In the end, we need not determine whether the exception is a feature of § 2423(b) cases because, even if it is, Schneider's conduct would not fall within it.

10

**3. The exception's application to Schneider's conviction**

We turn, then, to the question of whether Schneider's conviction could qualify for the "innocent round trip" exception. The modern-day version of the Mann Act, 18 U.S.C. § 2421, states that "[w]hoever knowingly transports any individual in . . . foreign commerce . . . with intent that such individual engage in . . . any sexual activity for which any person can be charged with a criminal offense, or attempts to do so, shall be [fined or imprisoned, or both]." 18 U.S.C. § 2421 (2000). On the other hand, the statute under which Schneider was convicted, 18 U.S.C. § 2423(b), states that "a United States citizen . . . who travels in foreign commerce . . . for the purpose of engaging in any sexual act (as defined in section 2246) with a person under 18 years of age that would be in violation of chapter 109A . . . shall be [fined, imprisoned, or both]." 18 U.S.C. § 2423(b) (2000). As applicable to Schneider, one of the sexual acts defined in § 2246 that would be in violation of chapter 109A is an adult knowingly engaging in a sexual act with a minor between the ages of twelve and sixteen years old who is at least four years younger than the adult. 18 U.S.C. § 2243(a) (2000). Schneider argues that § 2421 and § 2423(b) use similar language and have been interpreted in parallel; therefore, he contends, the District Court erred when it found the "innocent round trip" exception a basis for a judgment of acquittal on the § 2421 transport charge but not on the § 2423(b) travel charge.

We disagree. As an initial matter, we decline Schneider's invitation to compare his two counts of conviction. The District Court's disposition of Schneider's conviction under § 2421 is not before us, and therefore we do not comment on it.

11

Though *Mortensen* uses the language of a "dominant" purpose, our sister Circuits have held that "[i]t suffices if one of the efficient and compelling purposes in the mind of the accused in the particular transportation was [illegal sexual] conduct." *United States v. Campbell*, 49 F.3d 1079, 1082 (5th Cir. 1995) (internal quotation marks omitted); *see also Vang*, 128 F.3d at 1072. This is because the statement in *Mortenson* that the immoral purpose must be the defendant's most significant motivation has long been held to be dictum. "It now appears settled that . . . immoral conduct, need not be the sole reason for the transportation; the Act may be violated if [immoral conduct] is a dominant or a compelling and efficient purpose. Despite the contrary implication suggested by the word 'dominant,' it need not be the most important of defendant's reasons when multiple purposes are present." *United States v. Snow*, 507 F.2d 22, 24 (7th Cir. 1974) (footnotes omitted); *accord United States v. Lebowitz*, 676 F.3d 1000, 1014-15 (11th Cir. 2012); *United States v. Miller*, 148 F.3d 207, 212 (2d Cir. 1998); *United States v. Tyler*, 424 F.2d 510, 512 (10th Cir. 1970); *United States v. Bennett*, 364 F.2d 77, 78-79 & n.4 (4th Cir. 1966); *Nunnally v. United States*, 291 F.2d 205, 208 (5th Cir. 1961); *Bush v. United States*, 267 F.2d 483, 485 (9th Cir. 1959); *Daigle v. United States*, 181 F.2d 311, 314 (1st Cir. 1950); *Mellor v. United States*, 160 F.2d 757, 764 (8th Cir. 1947). Thus, resuming sexual contact with the victim need not be Schneider's only or most important purpose for a jury to convict him of violating § 2423(b).

Several facts directly link Schneider's travel from Russia to the United States and back with his desire to continue a sexually abusive relationship with the victim. The victim and Schneider's relationship was, from the outset, grounded in Schneider's promise that he would "make [the

12

victim] a star," which was the victim's father's dream. App. at 274. Further, from their very first meeting, Schneider had discussed with the victim his "interest[] in going to America." App. at 567-68. The victim was "interested about [sic] America" and "interested in going to America to study and, perhaps, to have a career." App. at 580-81. Schneider only had access to the victim because he was able to help him stay enrolled in a prestigious ballet academy and provide the resources to help propel the victim's ballet career. With this trip, Schneider was providing the victim with an exciting overseas excursion as part of Schneider's promise to propel his ballet career forward.

Thus, the trip to Philadelphia was a critical component of Schneider's scheme to sexually abuse the victim; it was not a "complete break or interlude" in the illicit activities. *See Mortensen*, 322 U.S. at 375. The trip was not an "innocent" recreational trip or vacation that may have had the incidental effect of currying favor with the victim and therefore is distinguishable from *Mortensen* and the other cases where the innocent round trip exception has been applied. *See, e.g., United States v. Ross*, 257 F.2d 292 (2d Cir. 1958) (defendant and prostitute took weekend recreational trips from New York to New Jersey); *Oriolo v. United States*, 324 U.S. 824 (1945) (per curiam) (defendant and prostitute took recreational trip to Atlantic City). Because the trip was part of Schneider's calculated plan to manipulate and abuse the victim, the *Mortensen* exception is inapplicable.

The "verdict must be assessed from the perspective of a reasonable juror, and the verdict must be upheld as long as it does not fall below the threshold of bare rationality." *Caraballo-Rodriguez*, 726 F.3d at 431 (internal quotation marks omitted). "Unless the jury's conclusion is irrational, it must be upheld. In our role as reviewers, we must resist the

13

urge to hypothetically insert ourselves into the jury room for deliberations." *Id*. at 432. Reviewing the evidence in the light most favorable to the prosecution, based on the facts and testimony described above, a rational jury could conclude that one of Schneider's efficient and compelling purposes of the trip from Moscow to Philadelphia and back was to further Schneider's sexually abusive relationship with the victim by continuing to lay the groundwork for the victim's dependence on Schneider. This conclusion disqualifies Schneider from the protection provided by the "innocent round trip" exception.

We will affirm the District Court's denial of Schneider's motion for a judgment of acquittal.

B.

Before trial, Schneider moved to dismiss the indictment as barred by a five-year statute of limitations. The District Court denied this motion, holding that the indictment was timely under 18 U.S.C. § 3283, a special provision extending the statute of limitations for offenses involving the sexual abuse of a child. We review de novo the denial of a motion to dismiss on statute of limitations grounds. *United States v. Hoffecker*, 530 F.3d 137, 168 (3d Cir. 2008).

Schneider was indicted on January 14, 2010. The general statute of limitations is five years after the offense is committed. 18 U.S.C. § 3282. Because the offense with which Schneider was charged occurred on August 22, 2001, he argues that § 3282 bars his prosecution. The Government argues that the statute of limitations does not apply because the version of 18 U.S.C. § 3283 in effect at the time of the offense expressly provided that "[n]o statute of limitations that would otherwise preclude prosecution for an offense involving the sexual . . . abuse of a child under the age of 18 years shall preclude such prosecution before the child reaches the age of 25 years." 18 U.S.C. § 3283 (2000). Thus, because

14

the victim was under twenty-five years old at the time of the prosecution, we must determine whether the offense with which Schneider was charged "involve[ed] the sexual . . . abuse of a child."

The extension of the statute of limitations for offenses "involving the sexual . . . abuse of a child under the age of 18 years" in § 3283 was originally codified at 18 U.S.C. § 3509(k) as part of the Crime Control Act of 1990, Pub. L. No. 101-647, 104 Stat. 4789 (1990), and later transferred verbatim to § 3283. There, "sexual abuse" is defined as including the "employment, use, persuasion, inducement, enticement, or coercion of a child to engage in . . . the rape, molestation, prostitution, or other form of sexual exploitation of children." 18 U.S.C. § 3509(a)(8).

Schneider argues that this extension of the statute of limitations cannot apply to an offense under 18 U.S.C. § 2423(b) because § 2423(b) merely "criminalizes interstate travel for an illicit purpose," *United States v. Tykarsky*, 446 F.3d 458, 469 (3d Cir. 2006), and does not require that any action be taken that "involv[es] the sexual . . . abuse of a child," 18 U.S.C. § 3283. The statute on its face does not require any actual illicit sexual conduct, but merely travel with the intent to engage in such conduct. Schneider therefore contends that by this plain reading, the sexual abuse of a child is not an "essential ingredient" of the offense of conviction.

In support, Schneider analogizes to *Bridges v. United States*, 346 U.S. 209 (1953). In that case, the Supreme Court examined the Wartime Suspension of Limitations Act ("WSLA"), 18 U.S.C. § 3287, which applied to offenses "involving the defrauding of the United States," *Bridges*, 346 U.S. at 215. The United States had charged the petitioner with making a false statement in his application for naturalization. *Id.* at 213. The Court had to determine whether such conduct

15

"involv[ed] the defrauding of the United States," much as we here must determine whether Schneider's conduct "involv[ed] the sexual . . . abuse of a child." The Court stated that Congress, in passing the WSLA, "was concerned with the exceptional opportunities to defraud the United States that were inherent in its gigantic and hastily organized procurement program. It sought to help safeguard the treasury from such frauds by increasing the time allowed for their discovery and prosecution." *Id.* at 218. As a result, the Court held that the WSLA did not apply to the offense of knowingly making a false statement under oath in a naturalization proceeding because "fraud is not an essential ingredient" of it. *Id.* at 222.

Schneider urges that we adopt a similar "essential ingredient" test in this case and rule that because sexual abuse is not an essential ingredient of a violation of § 2423(b), the statute of limitations remains at five years. He notes that a violation of § 2423(b) requires neither an actual child nor actual abuse, that Congress has not evinced a clear intent in § 3283 to eliminate the statute of limitations for "bad intent" crimes, and that statutes of limitations are to be "liberally interpreted in favor of repose." *Toussie v. United States*, 397 U.S. 112, 115 (1970) (internal quotation marks omitted).

We disagree. We hold that a violation of § 2423(b) for "travel[ing] in foreign commerce . . . for the purpose of engaging in any sexual act . . . with a person under 18 years of age that would be in violation of chapter 109A," 18 U.S.C. § 2423(b) (2000), involves the sexual abuse of a person under age 18. At the time of the offense, chapter 109A made it a crime to knowingly engage in a sexual act with a person between the age of twelve and sixteen years if the offender was more than four years older than the minor. *See* 18 U.S.C. § 2243(a).

16

Schneider's reliance on *Bridges* is inapposite. While *Bridges* did adopt an "essential ingredient" test, the limitations-extending statute at issue was a narrowly drafted exception specifically intended to target frauds related to war procurement. Unlike the WSLA, § 3283 has no such restrictive language or legislative history suggesting congressional intent to limit its application to a specific subset of circumstances. Congress, rather, has evinced a general intention to "cast a wide net to ensnare as many offenses against children as possible." *United States v. Dodge*, 597 F.3d 1347, 1355 (11th Cir. 2010) (en banc). The District Court's ruling is consonant with, not contrary to, that intent.

In particular, Schneider's conduct "involves sexual abuse" as contemplated by § 3283. Schneider was convicted of traveling with the purpose of engaging in sex with the victim, a minor. The victim testified that before the trip to Philadelphia, he and Schneider engaged in oral and anal sex three to four times per week; that upon returning to Moscow the sexual activities between Schneider and the victim resumed and continued to occur two to three times per week; and that Schneider engaged in psychological manipulation, urging the victim to keep Schneider's conduct secret, conceal any physical injuries, and stay away from girls.

Sexual abuse includes the "persuasion, inducement, enticement, or coercion of a child to engage in . . . sexually explicit conduct." 18 U.S.C. § 3509(a)(8) (2000). Sexual abuse as defined here encompasses a wider set of behavior than just rape or other unwanted sexual touching. Schneider agreed to sponsor the victim on the basis of his talent, paid for the victim's ballet academy fees, had the victim move into his apartment where he raped and sexually abused him repeatedly, and traveled with the victim to the United States so that the victim could attend a prestigious summer ballet

17

school. This series of actions sufficiently involves the "persuasion, inducement, enticement or coercion of a child to engage in . . . sexually explicit conduct" to invoke the longer statute of limitations for offenses "involving the sexual . . . abuse of a child." *See* 18 U.S.C. § 3509(a)(8) (2000); 18 U.S.C. § 3283 (2000). We will affirm the District Court's ruling that Schneider's violation of § 2423(b) involves sexual abuse of a child.

## C.

During his trial, Schneider sought to inform the jury that he had been continuously incarcerated for four to five months before trial, and was therefore unable to obtain treatment during that time for a medical condition. The District Court did not allow this statement because it was concerned with its prejudicial effect on the jury. The Court did allow Schneider to testify that it had been impossible for him to seek treatment during this period without mentioning his incarceration. He appeals the District Court's evidentiary ruling. "We review the District Court's decisions as to the admissibility of evidence for abuse of discretion." *United States v. Serafini*, 233 F.3d 758, 768 n.14 (3d Cir. 2000).

In July 2008, Schneider learned of the victim's allegations of sexual abuse, and in August 2008, the victim filed a civil complaint against Schneider. In November 2009, in connection with the civil case, the victim drew two pictures of Schneider's erect penis which depict a curvature, and on January 22, 2010, the victim signed an affidavit in the civil case describing Schneider's penis when erect, and attached the two drawings to the affidavit. As of January 27, 2010, the victim's attorneys had provided the affidavit and drawings to Schneider's attorneys.

On March 27, 2010, Schneider was arrested abroad. He was held for two days and released on bail on March 29,

2010. On May 17, 2010, Schneider was returned to custody, and on May 28, 2010, Schneider was brought to the Federal Detention Center in Philadelphia, where he was held through the trial. On August 4, 2010, while Schneider was detained, Dr. Victor Carpiniello, an expert urologist, examined Schneider's erect penis.

Dr. Carpiniello testified that the victim's description and drawings of Schneider's erect penis were consistent with a condition known as Peyronie's disease. This disease is caused by a formation of plaque, or hard fibrous tissue, on the penile shaft, which causes abnormal curvature. The curvature resulting from Peyronie's disease is mainly treated by surgical removal of the plaque, but potentially also by "injectable collagenase, radiation, oral vitamin E, topical vitamin E, Verapamil, Interferon Alpha 2B, iontoforesis and electro corporeal shock wave therapy," none of which are likely to leave scarring. App. at 984-85. Dr. Carpiniello also testified that when he examined Schneider, on August 4, 2010, he determined that Schneider had a normal erection without curvature and noted "no scarring or evidence of a procedure." App. at 969. Finally, Dr. Carpiniello noted that, in his opinion, Schneider does not have and never had Peyronie's disease.

Following Dr. Carpiniello's testimony, but prior to Schneider's testimony, Schneider's counsel informed the District Court that he intended to elicit testimony from Schneider that Schneider had been incarcerated for the prior four months, since May 27, 2010. The District Court instructed that Schneider could testify that from the date he went back into custody until the date of his testimony, it was impossible for him to seek treatment for Peyronie's disease. The District Court further ruled that Schneider could not "say or mention anything along the lines of prison," App. at 1315,

on the basis that evidence of Schneider's incarceration would be unfairly prejudicial and would create sympathy for him with the jury.

Evidence may only be admitted if it is relevant; that is, if it "has any tendency to make a fact more or less probable than it would be without the evidence; and . . . the fact is of consequence in determining the action." Fed R. Evid. 401. Not all relevant evidence, however, is admissible. A District Court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403. In this context, unfair prejudice means "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Fed. R. Evid. 403 advisory committee's note. Because the District Court allowed Schneider to testify that he could not receive treatment during the period from May 2010 until September 2010, but not that he was incarcerated during this period, we review only the judge's ruling prohibiting Schneider from commenting on his incarceration for abuse of discretion. *See Serafini*, 233 F.3d at 768 n.14. The District Court abuses its discretion if its decision "rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 165-66 (3d Cir. 2001) (internal quotation marks omitted). "In order to justify reversal, a [D]istrict [C]ourt's analysis and resulting conclusion must be arbitrary or irrational." *United States v. Universal Rehab. Servs. (PA), Inc.*, 205 F.3d 657, 665 (3d Cir. 2000) (en banc) (internal quotation marks omitted). Therefore, we examine whether the District Court arbitrarily or irrationally weighed this evidence's probative value against its danger of unfair prejudice.

**1. Probative value**

Schneider contends that this testimony holds probative value because it supports his argument to the jury that his penis did not match the victim's drawings and description, thus undermining a key piece of the evidence. He states that the facts that he was unable to receive treatment prior to the expert examination due to his incarceration and that the expert's testimony was that his penis—examined while incarcerated—did not match the victim's drawings and descriptions, support his argument that the victim did not have knowledge of what his penis looked like, and that Schneider therefore did not have sexual contact with the victim. Schneider contends that this adverse ruling "made it far more likely [that he] would be convicted on these charges by excluding compelling evidence that [the victim] had fabricated his claims of sexual abuse." Appellant's Br. at 47.

Schneider overstates the probative value of this testimony, as he had the ability to alter his penile condition prior to his ultimate incarceration before trial. Schneider first learned of the victim's accusations of sexual abuse in August 2008, eighteen months before he was initially arrested, and first learned of the victim's affidavit and drawings by January 27, 2010, two months before he was arrested. Furthermore, Schneider was free on bail for six weeks from March 29, 2010 to May 17, 2010. Because Schneider had multiple periods to receive treatment before he was incarcerated, the fact that he could not receive treatment in the months leading up to the trial has little probative value to the crucial issue of the victim's familiarity with Schneider's penis. In addition, because Schneider was permitted to mention that he could not receive treatment during the pre-trial period, the incremental probative value of mentioning his incarceration is low.

**2. Potential for unfair prejudice**

21

Schneider argues that allowing him to make this statement would have presented little potential for unfair prejudice. Schneider contends that "any general inclination to exclude from evidence the fact of a criminal defendant's pretrial incarceration is to protect the *defendant*, not the *prosecution*, from unfair prejudice." Appellant's Br. at 47-48. We disagree. While this argument is facially plausible, it is supported by no citation to any case law or secondary authority. *See* Appellant's Br. at 47-48. Nor do the Federal Rules of Evidence, either in their text or in the advisory committee's notes, contain any instruction or indication that evidence of incarceration is inadmissible if the defendant would be prejudiced, but admissible if the prosecution would be prejudiced.

The Government, on the other hand, argues that allowing Schneider to testify in this manner holds great potential for unfair prejudice. It contends that Schneider sought to stir sympathy with the jury, and identifies other cases where evidence was ruled inadmissible due to its potential to induce sympathy for the defendant in the jury. *See United States v. Harris*, 491 F.3d 440, 447 (D.C. Cir. 2007); *United States v. Pintado-Isiordia*, 448 F.3d 1155, 1158 (9th Cir. 2006) (per curiam). When a District Court decides whether evidence, such as Schneider's testimony, is admissible, it must weigh the probative value of the testimony with the potential for unfair prejudice. Only when the probative value is "substantially outweighed" by the potential for unfair prejudice is the evidence inadmissible. Schneider's testimony on incarceration has little probative value, but the potential for unfair prejudice is real. The District Court did not abuse its discretion in making this judgment.

We therefore will affirm the District Court's ruling on this issue.

22

## D.

At trial, the victim testified that Schneider showed him the film *Nijinsky*, which told the story of Vaslav Nijinsky, a ballet dancer in the early 1900s, and his older patron and lover, Sergei Diaghilev. The District Court admitted into evidence excerpts of the film which depict Diaghilev kissing Nijinsky, Nijinsky performing in a ballet that includes an act of simulated masturbation, and Nijinsky marrying a woman and becoming mentally ill. At various points, the Court also allowed the introduction of other testimony regarding a birthday card, porcelain figurines of faun-like creatures, payment for goods, and Schneider's psychological relationship with the victim.

After the trial, Schneider moved for a new trial due to the introduction of unduly prejudicial evidence, claiming that evidence relating to Count Two, upon which Schneider was ultimately granted a judgment of acquittal, prejudicially spilled over to the jury's assessment of Count One. The District Court ruled that while it committed error in admitting the evidence because it was unduly prejudicial, the introduction of the evidence was harmless. Schneider argues that the District Court erred, while the United States argues that the District Court properly admitted the evidence as intrinsic, and that the evidence was not unfairly prejudicial, or the error, if any, was harmless.

We review the District Court's decision for an abuse of discretion. *United States v. Butch*, 256 F.3d 171, 175 (3d Cir. 2001). If we find that the District Court abused its discretion, we review de novo whether that error was prejudicial or harmless. *United States v. Cross*, 308 F.3d 308, 317-18 (3d

23

Cir. 2002).[1] An error is harmless when it is "highly probable that it did not prejudice the outcome." *Id.* at 318 (internal quotation marks omitted). "While the Government bears the burden of showing that the error was harmless, we can affirm for any reason supported by the record." *Id.* at 326 (citation omitted).

"In practice, therefore, prejudicial spillover analysis . . . begins by asking whether any of the evidence used to prove the [count on which the defendant was acquitted] would have been inadmissible to prove the remaining count. . . . [I]f the answer is 'yes,' then we must consider whether the verdict on the remaining count was affected adversely by the evidence that would have been inadmissible at a trial limited to that count." *Id.* at 318. If all evidence on the discarded counts would remain admissible to prove the remaining count, our inquiry ends. *Id.*

As already noted, a court may exclude relevant evidence if "its probative value is substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403. Schneider argues that the *Nijinsky* excerpts were inadmissible to prove Count One because they "included sexual content unrelated to the charges in this case," were "extremely prejudicial," and were "compelling and emotional." Appellant's Br. at 50-51, 53, 64. He contends that the prosecutor "was permitted to show the jury highly prejudicial excerpts from that film that portrayed the older Diaghilev

---

[1] The error alleged here is not of constitutional dimension. If it were, it could only be called "harmless" if we could say that, beyond reasonable doubt, it did not contribute to the verdict. *See Mitchell v. Esparza*, 540 U.S. 12, 17-18 (2003).

seducing and then controlling the much younger Nijinsky," Appellant's Br. at 53, which was admitted solely to establish the victim's dependence on Schneider, a unique element of Count Two—a count on which Schneider was later granted a judgment of acquittal. In support, he notes that when the attorneys were discussing the admissibility of the *Nijinsky* excerpts at trial, the prosecutor stated that "[i]t shows his . . . control over the victim and the psychological inference." App. at 481. Furthermore, in her closing argument, the prosecutor mentioned the *Nijinsky* evidence as supporting an element of Count Two which was not required in Count One—compulsion. App. at 1625-26. Finally, ruling on the motion for a new trial after Schneider's conviction, the District Court wrote that it "agree[d that] excerpts of the film were unduly prejudicial inasmuch as they included sexual content unrelated to the charges in this case." App. at 49.

This argument is unpersuasive. The *Nijinsky* evidence is admissible as evidence intrinsic to Count One. Rule 404(b) "does not apply to evidence of uncharged offenses committed by a defendant when those acts are intrinsic to the proof of the charged offense." *Hoffecker*, 530 F.3d at 189 (internal quotation marks omitted). "[A]cts are intrinsic when they directly prove the charged [offense]." *Cross*, 308 F.3d at 320 (internal quotation marks omitted). "Even if the evidence is 'extremely prejudicial to the defendant,' 'the court would have no discretion to exclude it because it is proof of the ultimate issue in the case.'" *Hoffecker*, 530 F.3d at 189 (quoting *United States v. Gibbs*, 190 F.3d 188, 218 (3d Cir. 1999)). For example, the fact that Schneider showed the victim the movie and told him that he should not leave Schneider in the way that Nijinsky left Diaghilev made it more likely that Schneider and the victim had a sexual relationship before the trip to Philadelphia, which

consequently made it more likely that Schneider intended to resume a sexual relationship upon returning to Moscow. Furthermore, the other evidence of Schneider's prolonged psychological entanglement with the victim also directly proved the crime charged in Count One because it spoke to Schneider's purpose in traveling back to Russia—a key component of his ultimate conviction.

Because the conduct was intrinsic to Count One, *Cross*, 308 F.3d at 320, and the District Court's initial evidentiary ruling was not "clearly contrary to reason," *Butch*, 256 F.3d at 175 (internal quotation marks omitted), we hold that the District Court did not abuse its discretion in denying the motion for a new trial. More specifically, we hold that *Nijinsky* evidence is admissible as intrinsic evidence, in contrast to the District Court deeming its admission erroneous as unfairly prejudicial, but ultimately harmless. "[W]e can affirm for any reason supported by the record," *Cross*, 308 F.3d at 326, and we do so in this instance. Though we base our decision on a different ground, we will affirm the District Court's dismissal of a motion for a new trial on this issue.

E.

Schneider appeals the District Court's denial of his motion for a new trial under Federal Rule of Criminal Procedure 33(b)(1). Schneider claims he discovered new evidence in connection with the ongoing civil suit that the victim is pursuing against him "strongly suggest[ing] perjury by [the victim] at trial and a significant *Brady* violation."

Appellant's Br. at 64-65.[2] The District Court did not grant an evidentiary hearing on the matter and denied Schneider's motion for a new trial. We review the District Court's denial of a motion for a new trial for abuse of discretion. *United States v. Salahuddin*, 765 F.3d 329, 346 (3d Cir. 2014).

In order to succeed on a motion for a new trial based on newly-discovered evidence, the defendant carries the burden of establishing five elements:

> (a) [T]he evidence must be in fact newly discovered, i.e.[,] discovered since trial; (b) facts must be alleged from which the court may infer diligence on the part of the movant; (c) the evidence relied on must not be merely cumulative or impeaching; (d) it must be material to the issues involved; and (e) it must be such, and of such nature, as that, on a new trial, the newly discovered evidence would probably produce an acquittal.

*United States v. Quiles*, 618 F.3d 383, 388-89 (3d Cir. 2010) (internal quotation marks omitted).

## 1. Newly-discovered *Brady* violation

Schneider first asserts that he should be granted a new trial based on a newly-discovered violation of the rule in

---

[2] We have granted a motion to seal portions of the appendix filed in this case. In this section, we find it necessary to include some of the sealed information, but have revealed it in such a way as to carry out the intent and purpose of the motion to seal.

*Brady v. Maryland*, 373 U.S. 83 (1963). "To establish a due process violation under *Brady*, then, a defendant must show that: (1) evidence was suppressed; (2) the suppressed evidence was favorable to the defense; and (3) the suppressed evidence was material either to guilt or to punishment." *United States v. Pelullo*, 399 F.3d 197, 209 (3d Cir. 2005) (internal quotation marks omitted). Schneider's basis for his claim is that the victim testified in a deposition in his civil case that he was paid for his testimony in the criminal case—payments that were undisclosed to the defense. While ordinarily this would raise a red flag, *see, e.g., United States v. Bagley*, 473 U.S. 667, 683-84 (1985) (holding that there was a *Brady* violation when federal prosecutors withheld evidence of inducements made to witnesses to encourage them to testify against the defendant), in this case these revelations are insufficient to establish a *Brady* violation or other grounds for a new trial. In the victim's deposition, the following exchange occurred:

Q: Okay. Did you ever get witness vouchers from the government for testifying?

A: What is witness vouchers?

Q: I'm asking you. Do you know what they are?

A: I was paid for testifying.

Q: How did you get paid?

A: Michelle, Mrs. Morgan[3] went with me to the place to withdraw money.

. . .

---

[3] Assistant U.S. Attorney Michelle Morgan-Kelly.

28

Q: Did she go over to the place like to cash a check and she'd give them a slip of paper, they'd give you money?
A: Yes.
Q: And who was the slip of paper from?
A: From Michelle Morgan Kelly. [sic]

App. at 2353.

Schneider cannot carry his burden based on this testimony. First, he has not established that the evidence was undisclosed under *Brady* or that it was newly-discovered under Rule 33. The witness fees and per diem stipends that the victim was paid are required by statute. *See* 28 U.S.C. § 1821. Furthermore, the payments were disclosed on the second day of trial—and two days before the victim testified—in an email from an Assistant United States Attorney to Schneider's trial counsel, who responded that he did not intend to cross-examine the victim on it. Nor can Schneider establish that the payment of fees was favorable to the defense (the second *Brady* element) because the victim, an alleged crime victim, was paid via statutorily-mandated vouchers, unlike the witness in *United States v. Bagley*, who was paid in cash as a cooperating informant in exchange for information. 473 U.S. at 683. The District Court "[found] Schneider's argument as to the witness vouchers baseless," and denied the motion for a new trial on this ground. App. at 65.

Therefore, we will hold that District Court did not abuse its discretion in denying Schneider's motion for a new trial on this basis.

29

**2. Newly-discovered perjury**

Schneider next asserts that he should be granted a new trial based on his discovery that the victim perjured himself in connection with the civil trial. The District Court rejected this argument, which we review for abuse of discretion. *Salahuddin*, 765 F.3d at 346. Schneider contends that here we should use the test from *Larrison v. United States*, 24 F.2d 82 (7th Cir. 1928), to determine whether he should be granted a new trial. This test has three prongs:

> (a) The court is reasonably well satisfied that the testimony given by a material witness is false. (b) That without it the jury might have reached a different conclusion. (c) That the party seeking the new trial was taken by surprise when the false testimony was given and was unable to meet it or did not know of its falsity until after the trial.

*Larrison*, 24 F.2d at 87-88. Not only has "[t]he *Larrison* test . . . not been adopted by this Court," *Gov't of V.I. v. Lima*, 774 F.2d 1245, 1251 n.4 (3d Cir. 1985), but even the Seventh Circuit has subsequently abandoned it, *United States v. Mitrione*, 357 F.3d 712, 718 (7th Cir. 2004) ("Today, we overrule *Larrison* and adopt the reasonable probability test."), *vacated on other grounds*, 543 U.S. 1097 (2005). Therefore, we use the same five-factor test from *Quiles* identified above. 618 F.3d at 388-89.

Schneider says that he discovered "notes taken by a professional quoting the lone accuser saying that he committed perjury in relation to the same case, fears going to prison if found out, and is concerned that the conviction will be overturned." Appellant's Br. at 65-66. His argument fails at least on the fifth prong—"[the newly discovered evidence]

must be such, and of such nature, as that, on a new trial, the newly discovered evidence would probably produce an acquittal." *Quiles*, 618 F.3d at 388-89 (internal quotation marks omitted). The evidence of this alleged perjury that Schneider complains of consists of the victim's psychologist's notes and summaries of sessions in May and June 2012. These notes and summaries describe the victim's worry about minor inconsistencies in the civil case and the victim's trial strategy.

Schneider's argument is unavailing. First, Schneider is unable to identify any specific alleged perjury. Further, when these excerpts are placed in context of the overall timeline of the civil case, it becomes clear that there is no perjury and that the victim was concerned about inaccuracies in his testimony about Susan Schneider,[4] Kenneth Schneider's sister, in a civil case deposition. As noted above, the victim sued Schneider, Schneider's parents, Schneider's siblings, and the Apogee Foundation[5] in a civil suit. The victim was first deposed in connection with this suit on February 28, 2012, where he discussed, among other things, Schneider's sister. In April 2012, he spoke with his initial attorney about the civil case, and expressed his concerns about his testimony in the civil case to his psychologist in May 2012. The psychologist's notes were obtained by the defense on August 3, 2012, and turned over to the victim's new attorneys shortly

---

[4] Susan Schneider was not a party to the criminal prosecution and did not testify in connection with the criminal prosecution.

[5] The Apogee Foundation is Schneider's purported charitable foundation for gifted children in the fine arts. The victim was nominally a board member of the foundation.

31

thereafter. A few days later, the victim, through his attorneys, provided two points of errata to correct his February deposition regarding statements he previously had attributed to Susan Schneider. *See* Supp. App. at 59-69. Given this context, it appears that the victim's comments to his psychologist concern testimony he gave about Susan Schneider's comments, and do not constitute testimony that would rise to the level of perjury which would be "of such nature, as that, on a new trial, the newly discovered evidence would probably produce an acquittal." *Quiles*, 618 F.3d at 388-89 (internal quotation marks omitted). In addition, the psychologist's notes are also strongly corroborative of the victim's testimony at trial. They include statements about Schneider's predatory and abusive relationship with the victim. App. at 2325.

Because the District Court did not abuse its discretion when it declined to hold an evidentiary hearing on or grant Schneider's motion for a new trial based on the newly-discovered "perjury," we will affirm the District Court's ruling.

F.

When it sentenced Schneider, the District Court began by selecting United States Sentencing Guideline ("U.S.S.G.") § 2A3.2 as the starting point for its offense level calculation. The District Court then invoked a cross-reference found in § 2A3.2, which dictates that "[i]f the offense involved criminal sexual abuse or attempt to commit criminal sexual abuse (as defined in 18 U.S.C. 2241 or 2242), apply § 2A3.1." U.S. Sentencing Guidelines Manual § 2A3.2(c)(1) (2000). The District Court determined that Schneider's offense level under § 2A3.1 was thirty-five. Schneider appeals the District Court's use of the § 2A3.1 cross-reference.

"We exercise plenary review over a district court's interpretation of the Sentencing Guidelines." *United States v. Solomon*, 766 F.3d 360, 364 (3d Cir. 2014). As the first step in calculating the Guidelines range, a court must "[d]etermine the offense guideline section in Chapter Two (Offense Conduct) applicable to the offense of conviction (i.e., the offense conduct charged in the count of the indictment or information of which the defendant was convicted)." U.S.S.G. § 1B1.2(a). Next, "[a]fter determining the appropriate offense guideline section pursuant to subsection (a) of this section, determine the applicable guideline range in accordance with § 1B1.3 (Relevant Conduct)." *Id.* § 1B1.2(b).

The term "offense," as used in the cross-reference, "means the offense of conviction and all relevant conduct under § 1B1.3." *Id.* § 1B1.1 cmt. n.1(H). Therefore, the cross-reference may be invoked if Schneider's offense of conviction "involved . . . sexual abuse" or if Schneider's relevant conduct under § 1B1.3 "involved . . . sexual abuse." *Id.* § 2A3.2(c)(1). The District Court found that Schneider's relevant conduct under § 1B1.3 "involved sexual abuse" sufficient to trigger the cross-reference. It is this ruling that Schneider appeals.

Section 1B1.3 provides that, "[u]nless otherwise specified, (i) the base offense level where the guideline specifies more than one base offense level, (ii) specific offense characteristics and (iii) *cross references in Chapter Two*, and (iv) adjustments in Chapter Three, *shall be determined on the basis of the following*:

> (1)(A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant . . . that occurred during the commission of the offense of conviction, in preparation for that

33

offense, or in the course of attempting to avoid detection or responsibility for that offense; . . . [and]

. . .

(3) all harm that resulted from the acts and omissions specified . . . above, and all harm that was the object of such acts and omissions."

*Id.* § 1B1.3 (emphases added). Thus, the District Court was correct to consider all of Schneider's acts that occurred in preparation for his offense and during the commission of his offense, as well as all harm that resulted from those acts. Furthermore, *"[c]onduct that is not formally charged or is not an element of the offense of conviction may enter into the determination of the applicable guideline sentencing range."* U.S.S.G. § 1B1.3 cmt. background.

Schneider's offense was a violation of 18 U.S.C. § 2423(b) (2000)—foreign travel with the intent to engage in a sexual act with a minor between the ages of twelve and sixteen. The District Court provided a list of Schneider's actions that were relevant to this offense and pertained to Schneider's sexual relationship with the victim. First, it noted that Schneider was able to commit the offense because he had cultivated a years-long sexual relationship with the victim by means of sexual abuse enabled by the victim's dependence on Schneider. App. at 2296. It also wrote that "Schneider fostered the illicit relationship through physical and psychological manipulation and economic threats with the intent of maintaining the sexual abuse until and beyond the time of the conduct constituting the offense of conviction." *Id.*

34

The District Court did not err. These actions are relevant offense conduct that "involve sexual abuse" because they were "acts . . . that occurred . . . in preparation for [the] offense"—Schneider's plan to travel back to Russia in order to continue sexually abusing the victim—and because they facilitated "harm that resulted from [these] acts"— Schneider's sexual abuse by force of the victim when he returned to Russia. U.S.S.G. § 1B1.3. We will affirm the District Court's invocation of the cross-reference in U.S.S.G. § 2A3.2(c)(1).

IV.

For the reasons set forth above, we will affirm the judgment of the District Court.