**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 19-3573
_____

UNITED STATES OF AMERICA

v.

KENNETH SCHNEIDER,
Appellant
_____

On Appeal from the District Court
for the Eastern District of Pennsylvania
(D.C. No. 2:10-cr-00029-001)
District Judge: Honorable Juan R. Sánchez
_____

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
February 11, 2021
_____

Before: CHAGARES, SCIRICA and RENDELL, <u>Circuit</u> <u>Judges</u>.

(Filed: April 23, 2021)

_____

OPINION[*]
_____

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

CHAGARES, Circuit Judge.

Kenneth Schneider was sentenced to 180 months of imprisonment after he was convicted of one count of traveling for the purpose of engaging in sex with a minor, in violation of 18 U.S.C. § 2423(b). He now challenges the District Court's denial of his petition to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255. We will affirm the judgment of the District Court for the reasons we explain below.

I.

We write only for the parties, so our summary of the facts is brief. In January 2010, a grand jury in the Eastern District of Pennsylvania indicted Schneider on one count of traveling for the purpose of engaging in sex with a minor, 18 U.S.C. § 2423(b), and one count of transporting a person for criminal sexual conduct, 18 U.S.C. § 2421.

The charges against Schneider rested on allegations that he had committed an egregious pattern of sexual abuse against a Russian boy, who we will refer to as "RZ," for several years from the late 1990s to the mid-2000s. See United States v. Schneider, 801 F.3d 186, 189-91 (3d Cir. 2015). Schneider and the Government agree on many of the facts about his relationship with RZ: Schneider, an American, had practiced law in Moscow and supported ballet artists for several years when, in 1998, he was introduced to the 12-year-old boy. RZ's family could no longer afford room and board for his ballet lessons at the Bolshoi Academy, so Schneider offered to sponsor RZ and obtained RZ's parents' permission to have the boy live with him in Moscow during the week.

RZ then lived with Schneider and Schneider's family for several years. During this time, Schneider brought RZ with him from Russia to the United States to attend a

2

summer ballet program in greater Philadelphia, from which Schneider and RZ returned to Russia on August 22, 2001. Although the Government anchored its charges in the August 22, 2001 trip, Schneider and RZ made a longer-term return to the United States beginning in 2002, where RZ finished high school, started college, and danced professionally. While attending college, RZ met Gina D'Amico, who he eventually married in 2007. RZ first made his allegations of sexual abuse against Schneider public in 2008 when he filed a civil lawsuit claiming that Schneider had sexually abused him for years.[1]

Those allegations laid the groundwork for the Government's criminal prosecution of Schneider. Because Schneider acknowledged that he had supported RZ but denied any allegations of sexual wrongdoing, the central dispute in Schneider's criminal trial was a credibility contest over whether his relationship with RZ had in fact been sexual.

To this end, the Government most significantly put forward evidence that by August 2000, Schneider was having oral and anal sex with RZ several times per week. The Government also elicited testimony tending to show that Schneider had groomed RZ and manipulated him to keep silent about Schneider's abuse. The Government's evidence showed that Schneider had taken an "audition" video of RZ practicing ballet in his underwear and that Schneider never caused the tape to be viewed at any ballet schools, and that Schneider had told RZ to use an unusually informal Russian term of address for him. RZ also testified that Schneider had shown him a Russian film

---

[1] RZ's civil lawsuit resulted in a settlement in December 2014.

3

glorifying the relationship between a young ballet dancer and his mentor, compared his and Schneider's relationship to the one in the film, and advised RZ not to make the mistake of leaving him for a woman. The Government presented further evidence that tended to show Schneider's manipulative tactics, including that Schneider threatened RZ that if he discussed the abuse RZ would be unable to travel to the United States, that Schneider told RZ to lie to his school nurse about anal injuries, and that Schneider tried to end RZ's relationship with the woman he would eventually marry.

With Schneider denying any allegations of sexual abuse, he instead tried to cast RZ as a liar motivated by greed and the prospect of a large civil recovery. Schneider therefore focused his trial strategy on undermining the credibility of the Government's witnesses. His attorneys presented an extensive defense with testimony from Schneider, his family members, RZ's civil lawyer and therapist, and various fact witnesses about the relationship between Schneider and RZ in Russia. Schneider now claims that he received ineffective assistance of counsel as to three elements of that defense.

First, Schneider's lawyer made several references to an article in Kommersant, Russia's main business newspaper, which described Schneider as a homosexual and a pedophile. These references occurred during Schneider's opening statement, while examining RZ's parents and Bolshoi instructors, and when Schneider took the stand in his own defense. Schneider's lawyer repeatedly either told the jury or elicited from witnesses that the piece had been retracted several days after the newspaper had published it.

4

Second, Schneider's counsel called RZ's therapist and lawyer as witnesses. On direct examination, Schneider's attorney worked to elicit from the therapist testimony about how little information RZ had provided her about any history of sexual abuse. During the Government's cross-examination, however, she testified that victims of sexual abuse sometimes have difficulty disclosing their past trauma. Similarly, while RZ's lawyer provided some helpful testimony for Schneider — including that he had intervened in RZ's psychological treatment — he also testified that he thought RZ's claims were meritorious enough to pursue a civil action and offered his own negative opinions about Schneider's conduct and legal exposure.

Third, while the parties' closing arguments were otherwise unremarkable, Schneider's counsel at one point offered a comment characterizing the charges against Schneider as "made up, is maybe, too strong." Appendix ("App.") 13. This remark came after Schneider's attorney discussed the Government's second charge of transporting a person for the purpose of criminal sexual conduct.

The jury returned a guilty verdict on both counts. The District Court acquitted Schneider on the § 2421 charge after a post-trial motion and sentenced Schneider to 180 months of imprisonment. Schneider directly appealed and we affirmed the conviction in 2015. See Schneider, 801 F.3d at 205. After the Supreme Court denied certiorari over Schneider's direct appeal, see Schneider v. United States, 136 S. Ct. 1217 (2016), Schneider filed a petition under 28 U.S.C. § 2255, alleging that his trial counsel was ineffective on, inter alia, the grounds discussed above.

The District Court denied Schneider's petition. See United States v. Schneider, Civ. No. 17-935, 2019 WL 4242637 (E.D. Pa. Sept. 6, 2019). It found that Schneider's counsel introduced the Kommersant article as part of a reasonable trial strategy, and that his counsel's discussion of the article's retraction cured any potential prejudice. The District Court further concluded that Schneider's counsel had been similarly strategic in calling RZ's therapist and lawyer, and that the "made up, is maybe, too strong" closing argument remark may have been strategic and in any event had not caused Schneider prejudice.

Schneider timely sought leave to appeal, and we granted a certificate of appealability on the three ineffective assistance claims set forth above.

II.

The District Court had jurisdiction over Schneider's prosecution under 18 U.S.C. § 3231, and over Schneider's collateral petition under 28 U.S.C. § 2255. We have appellate jurisdiction under 28 U.S.C. §§ 1291, 2253. When reviewing the denial of a § 2255 petition, we examine "legal determinations de novo, factual findings for clear error, and matters committed to the District Court's discretion for the abuse thereof." United States v. Doe, 810 F.3d 132, 142 (3d Cir. 2015). Among those matters committed to the District Court's discretion is whether to grant an evidentiary hearing. United States v. Scripps, 961 F.3d 626, 631 (3d Cir. 2020).

III.

We evaluate Sixth Amendment ineffective assistance of counsel claims under the framework provided by Strickland v. Washington, 466 U.S. 668 (1984). Under

6

Strickland, Schneider must show that (1) any errors by his lawyers were so serious that his counsel did not perform the function guaranteed by the Sixth Amendment, and (2) his lawyers' deficient performance prejudiced him.  Id. at 687.

To meet the first prong of the Strickland test, Schneider must show that his lawyers' performance was so deficient that it "fell below an objective standard of reasonableness."  Scripps, 961 F.3d at 632 (quoting Strickland, 466 U.S. at 688).  In assessing this performance, we "must indulge a strong presumption that counsel's conduct was within the wide range of reasonable professional assistance."  Strickland, 466 U.S. at 689.  Schneider bears the burden of rebutting this presumption "by showing either that the conduct was not, in fact, part of a strategy or by showing that the strategy employed was unsound."  Thomas v. Varner, 428 F.3d 491, 499-500 (3d Cir. 2005) (footnote omitted).  To the extent the record "does not explicitly disclose trial counsel's actual strategy or lack thereof," he may only do so "through a showing that no sound strategy posited by the [Government] could have supported [his counsel's] conduct."  Id. at 500.   When assessing Strickland's second prong of prejudice, a court must determine whether there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," which is "a probability sufficient to undermine confidence in the outcome."  466 U.S. at 694 (emphasis added).

Schneider asserts that the introduction of the Kommersant article, his attorney's decision to call RZ's therapist and lawyer, and his counsel's remark during closing

argument were each incidents of inadequate assistance that prejudiced him at trial. We disagree and address each claimed error in turn.

A.

Schneider first argues that his lawyer was defective when he introduced the Kommersant article calling Schneider a homosexual and pedophile. Although we agree that the content of the article could be inflammatory, cf. United States v. Cunningham, 694 F.3d 372, 390-91 (3d Cir. 2012) (vacating defendant's conviction where inflammatory child pornography evidence created prejudice substantially outweighing its probative value), especially without further context, our inquiry does not end there. Rather, the record supports the District Court's conclusion that each time Schneider's attorney discussed the article, he did so in a way that could readily be understood as part of a deliberate strategy. Schneider's counsel first mentioned the article during his opening statement, where he explained that it was an example of underhanded Russian business and political tactics, that if the article were true Schneider would have been prosecuted in Russia, and that the article's retraction and RZ's parents' contemporaneous trust in Schneider instead showed Schneider's innocence.

This theme explains further references to the article. We see no error in the District Court's understanding of the record to show that Schneider's counsel introduced the article to demonstrate that "no one … actually believed Schneider was a pedophile at the time the article came out," and that "Schneider was being unfairly targeted." App. 11. When cross-examining RZ's father, for instance, Schneider's counsel attempted to have him acknowledge that he was aware of the article's content and its retraction when

8

he concluded it would be safe to entrust Schneider with RZ's care in America. Similarly, Schneider's lawyer's questions to RZ's mother about the article and its retraction were consistent with an attempt to show that she trusted Schneider with RZ's care, rather than being "untethered to any point or theory" as Schneider asserts. Schneider Br. 25. The same goes for the testimony that Schneider's counsel elicited from Bolshoi instructors Tatiana Dokukina and Nikolai Dokukin. Schneider's lawyer explained at trial that he had elicited Dokukina's testimony about the article to explain her mental state, and to show that she knew the accusation to be false. Similarly, the line of questions directed at Dokukin was designed to elicit testimony about a strained political relationship between Schneider and senior Bolshoi management. Finally, when Schneider testified about the article on direct examination, he similarly did so in a way designed to show political bias on the part of Bolshoi management, which was also consistent with an attempt to elicit favor and sympathy from the jury.

Nor are we persuaded by Schneider's attempt to cast the <u>Kommersant</u> article's introduction as a failure on the part of his counsel to investigate potential exculpatory witnesses. See <u>Rolan v. Vaughn</u>, 445 F.3d 671, 682 (3d Cir. 2006). Schneider did not need to call more witnesses simply to show that the article had been retracted, or to testify generally about the Russian practice of <u>kompromat</u>.[2] Rather, Schneider's counsel strategically introduced the article to show its effect — or more specifically, the lack

---

[2] "[C]ompromising information collected for use in blackmailing, discrediting, or manipulating a person…esp. for political purposes." <u>Kompromat</u>, OXFORD ENG. DICTIONARY (Dec. 2020), https://www.oed.com/view/Entry/89270850.

9

thereof — on its readers. Just because this strategy did not result in an acquittal does not mean it was an unviable one, and we will not "second-guess" with "post hoc determinations that a different trial strategy would have fared better." Id. at 681-82. Because Schneider has not shown that "no sound strategy" could have supported his counsel's actions in raising the Kommersant article, see Thomas, 428 F.3d at 499-500, Schneider fails to satisfy Strickland's first prong here.

B.

Schneider next argues that he was denied effective assistance of counsel when his attorney called RZ's therapist, Christina Bates, and RZ's lawyer in his civil case against Schneider, E. William Hevenor. We are unpersuaded that the District Court erred when it denied relief as to both these claims of ineffective assistance.

First, Schneider claims that the testimony his lawyer elicited from Bates revealed "classic indicators of prior trauma" which corroborated the Government's theory of the case and reflected his counsel's "lack of preparation and thorough record review." Schneider Br. 41, 43. But the District Court was correct to conclude that the trial record reveals that "counsel's decision to call her in the original instance was reasonable." App. 16. Schneider's counsel repeatedly inquired about how little RZ had revealed about any trauma he might have experienced, with the goal of showing to the jury that RZ's failure to discuss past trauma tended to show its nonexistence.

Nor does Schneider's counsel's strategy reflect a lack of preparation or insufficient review of the record. Schneider complains that his attorney incompetently opened the door for the Government to use its cross-examination to reframe RZ's silence

10

as consistent with a history of sexual abuse. But it is not incompetence simply for an attorney to introduce helpful evidence that an opposing party tries to recharacterize or discredit on cross-examination, see, e.g., Drake v. Clark, 14 F.3d 351, 356 (7th Cir. 1994), especially where, as here, Bates's notes helped Schneider because they indicated she had difficulty characterizing RZ's symptoms as a result of molestation.

We are similarly unpersuaded to the extent that Schneider now attempts to cast the decision to call Bates as a failure to review her treatment records adequately. Schneider's attorney was attentive to Bates's notes at trial, and reasonably chose to call Bates as a witness rather than RZ's other therapist, who RZ selected with the aid of his civil lawyer and who may well have been a worse witness for Schneider. Accordingly, we conclude that Schneider's lawyer acted reasonably when he chose to call Bates, and are furthermore unpersuaded that the Government's attempts to neutralize the effect of Bates's testimony prejudiced Schneider within the meaning of Strickland or even made him any worse off than if Bates had never been called.

Second, Schneider argues that his lawyer erred in calling Hevenor. Schneider claims that his counsel incompetently elicited testimony from Hevenor laying out Hevenor's theory of the case in the civil suit against Schneider, and failed to lead Hevenor as a hostile witness under Federal Rule of Evidence 611(c)(2).

But here, too, we agree with the District Court that calling Hevenor was neither unreasonable nor prejudicial to Schneider. To begin with, when Hevenor offered improper remarks on RZ's civil case outside the scope of Schneider's questions, Schneider's attorney worked diligently to ensure the District Court reined in Hevenor's

testimony.  We further agree with the District Court that it was reasonable to probe the factual basis on which Hevenor asserted civil claims against Schneider's parents who the Government neither prosecuted nor called as witnesses — and that in a credibility contest between Schneider and RZ, it was reasonable for Schneider's attorney to show the substantial financial reward motivating RZ.  It may also have been strategic to present that number through testimony from a reticent Hevenor rather than only through other sources.  Moreover, Hevenor testified to his role in intervening in RZ's therapeutic treatment and helping to select RZ's new therapist once Bates noted that RZ suffered no impairment in functioning.  Schneider's counsel could have reasonably elicited this evidence to show that RZ had tried to "cherry pick" a clinical validation for his allegations in order to cast doubt on any attempt to corroborate RZ's claims.

Finally, even if Schneider's counsel was deficient in calling Hevenor, we remain in agreement with the District Court that there was no reasonable probability that his testimony would affect the outcome of Schneider's trial.  In addition to the lengthy case the Government presented, the jury was fully aware of the nature of Hevenor's relationship with RZ.  With Hevenor's bias established, the impact of any improper or inflammatory remarks was in all probability muted in the jury's eyes, and therefore did not prejudice Schneider.

## C.

Schneider furthermore takes issue with his attorney's closing remark characterizing the charges against Schneider as "made up, is maybe, too strong." Schneider Br. 52.  Schneider argues that because his attorney's comment qualified the

12

notion that the charges were "made up," it operated as an unauthorized concession of guilt in the context of a defense that sought principally to undermine RZ's credibility.

We disagree. Schneider's attorney made clear throughout the trial and his closing argument that Schneider maintained his innocence. Schneider's counsel made the "made up" remark while discussing how the Government needed to prove that Schneider had traveled with RZ for the purpose of engaging in illegal sexual activity. We agree with the District Court that in that context, the remark could have served numerous strategic purposes. These could be to ingratiate Schneider's counsel with the jury; to acknowledge the undisputed fact that Schneider and RZ had traveled together; or to suggest that because both Schneider and RZ lived in Russia, the Government could in no case prove that Schneider's primary purpose in returning there was to sexually abuse RZ. Certainly, Schneider's attorney's remark does not rise to the level of a total concession of guilt before the jury like an attorney might make in a two-phase capital case. See McCoy v. Louisiana, 138 S. Ct. 1500, 1508-09 (2018); Florida v. Nixon, 543 U.S. 175, 188-89 (2004).

In any case, we agree with the District Court that this single remark did not prejudice Schneider and carried no reasonable probability of affecting the trial's outcome in light of Schneider's repeated invocations of innocence in the face of substantial testimony against him. Because we are unpersuaded that Schneider has satisfied both

prongs of <u>Strickland</u> here, we will not disturb the District Court's denial of relief on this claim of ineffective assistance.

## IV.

For the foregoing reasons, we will affirm the District Court's denial of Schneider's § 2255 petition.